in our last case, de Reyes v. Waples Mill Mobile Home Park Limited Partnership. Mr. Ramakumar. May it please the Court, Archith Ramakumar, from Quinn Emanuel, Urquhart & Sullivan, on this case. This is a case about discrimination, not against undocumented immigrants, but against Latino individuals. It is undisputed that each of the leaseholders in this case was legally present and otherwise qualified to rent a lot in the park. Yet, despite that fact, when the policy was enforced, they and their families were forced to leave the park as a result of the policy. The effect on the leaseholders and their families, as pled in the complaint, plausibly states a disparate impact claim under the Fair Housing Act. The contrary decision reached below was error. The starting point for this conclusion is the Supreme Court's decision in inclusive communities. Now, in inclusive communities, the Supreme Court We had 12B6, so we had summary judgment. Your Honor, this is an appeal of a 12B6 ruling that the district court only formalized at the summary judgment stage, but he made it clear that he disposed of the disparate impact claim at the 12B6 stage. Now, in inclusive communities, the Supreme Court stated that FHA disparate impact claims are undoubtedly cognizable given the statute's text and history. Justice Kennedy also wrote, however, that such claims are subject to a robust causality requirement. The text of inclusive communities and subsequent decisions interpreting that precedent show that the robust causality standard is best understood as imposing a duty on plaintiffs to identify a policy or policies responsible for a statistical disparate. In the preceding sentence articulating that there was a policy here, the policy, Your Honor, is the policy requiring residents to provide a Social Security card or in the absence of a Social Security card, a visa, I-94 and passport. In other words, it is a policy that requires proof of legal presence as a prerequisite for living at the park. With the aim to try to identify undocumented immigrants, I guess. Yes, Your Honor. So, the policy makes a facially neutral distinction on the basis of legal presence. Our position is that facially neutral distinction is nonetheless a disguise for invidious discrimination. So, you presented the statistical disparity that Latino was 10 times more likely to be such than anybody else. Yes, Your Honor. So, in the complaint... Is that alone enough? So, Your Honor, in the complaint, we first identified the policy and explained how that policy was tethered to various statistical disparities and then proffered statistical evidence at the state level showing that Latinos, for example, are a disproportionate member of the undocumented community and then conversely, the undocumented immigrants are also... Where did the district court go wrong on this? Your Honor, we believe the district court erred in a historical analysis in concluding that the context of this particular disparate impact claim was outside the usual context of disparate impact claims such that as a result, the disparate impact claim here could not go forward. In particular, the district court traced Griggs and other disparate impact decisions and found ultimately that here, the context was different and distinct from the context in which disparate impact claims arose. However, as we demonstrated in our brief, since Griggs, the Supreme Court has expanded disparate impact liability to numerous other arenas including age and gender discrimination. Accordingly, we believe the district court erred in using the history of disparate impact as a forward-looking limit on disparate impact claims like the present claim. Are you arguing that we must look to the purpose of the challenge policy to determine whether  I'm sorry, Your Honor? Are you arguing that we must look at the purpose of the challenge policy to determine whether there was a disparate impact? Your Honor, we're not necessarily arguing that you must look at the purpose of the challenge policy, but rather simply at the statistical evidence identified in the complaint in conjunction with the fact that a specific policy as opposed to a bare statistical imbalance was identified in this case. Now, in inclusive communities, the Supreme Court cited Ward's Cove for the proposition that a robust causality must be met. And in Ward's Cove and subsequent Title VII cases, a specific hiring practice must be identified in a complaint in order to survive a dismissal challenge. Thus, the robust causality requirement can be understood as an analog to the requirement that a specific hiring practice must be identified. Here, however, a specific policy was identified. And the policy requirement in inclusive communities operates to winnow out a number of lawsuits. Indeed, the parties have cited cases on both sides dismissing claims that do not identify a specific policy. Now, tell me if this is an oversimplification of your position. That is that we're at the pleading stage, 12B6, and your aim here is to simply establish a prima facie case. And that if we look at inclusive communities, Justice Kennedy said, okay, disparate impact may be used in the, let's say, the FHA context. And having done that, then the question is, is there a policy there? And once you get to that position that the policy is there and you've got disparate impact, the prima facie case, there's another question to be asked down the road that probably might be fatal to your case, and that goes more into the causative aspect of it there. But is it your position we're just not there yet? We're at the prima facie stage and the district court foreclosed you by saying, sort of inverting it, by saying the policy has to cause it as opposed to the disparate impact arises from the policy? So, Judge Wynn, I would agree in essence that our position is the fact that at the pleading stage, we have plausibly stated a disparate impact claim by identifying a policy tethered to a statistical disparity flowing from that policy, and the district court erred by putting the cart before the horse in a number of respects. So, you're saying the legitimate non-discriminatory reason in the burden-shifting analysis was not properly before the court and the court relied on that? Well, Your Honor, our position is that given that the complaint and the subsequent evidence proffered at summary judgment properly made out a prima facie disparate impact claim, the burden then shifted to the other side to prove a business necessity sufficiently compelling to justify the challenge practice. Is the answer yes? I mean, isn't the next question going to be whether there's a legitimate reason for passing this policy, which has not been reached? Well, Your Honor, the reason I'm answering the question that way is because the parties did brief a disparate treatment claim that the district court interpreted the complaint as assertive. Are you seeking relief under the FHA under disparate treatment as well as disparate impact? No, Your Honor, we are only seeking relief under disparate impact. I think a little diagram in your case, 60% of the residents are in this circle. The impact was 11 of 12 families who are Latino, and so it's a pretty big impact, isn't it? Yes, Your Honor, we believe that the impact was disproportionate on Latino families. Okay, but you're really relying on the fact that they are undocumented aliens, aren't you? Excuse me, isn't that the essence? You're saying that they are being treated differently because of national origin, when in fact they're being treated as they are because of their unprotected status of being undocumented aliens, isn't that correct? Your Honor, I would agree that the statistical evidence in the complaint certainly relies on the documented status, but would further submit that the complaint offers anecdotal evidence, for example, that the leaseholders, the male plaintiffs in this case, were all legally present and yet were affected by the policy in this case. And therefore, it affects a substantial portion of the Latino community. Yes, Your Honor, that is correct. So, are you drawing a distinction then between the males and the females in your complaint? No, not a distinction per se, Your Honor. Rather, our position is that both of those pieces of evidence together more than enough to satisfy the robust causality requirement. We offer the statistical evidence showing the outsized impact on the undocumented population and then also offer anecdotal evidence of the effect on the male plaintiffs. With respect to the legitimate non-discriminatory reason point to just return back, the reason that I made a distinction is because this Court held in Betsy v. Turtle Creek Associates that after a prima facie disparate impact claim is made, the burden shifts to articulate and prove a business necessity sufficiently compelling to justify the challenge practice. And that is a different and more difficult burden than the legitimate non-discriminatory reason articulated by the appellees in this case. Now, the District Court never reached the question of whether a business necessity was proffered by the appellees, though it did reach the question of whether a legitimate non-discriminatory reason was proffered in the context of the disparate treatment claim. Given that the District Court never reached the business necessity question, however, and given the factual disputes that predominate on that issue, it makes the most sense for the Court to vacate and remand on that question. Appellees have offered a number of legitimate non-discriminatory reasons that they articulated before the District Court. However, as demonstrated in our brief and through the record, there are a number of factual disputes for each of them as to whether they rise to the level of a business necessity and, in any event, a number of them can be accomplished through less discriminatory means. The chief example identified both below and in our brief is the use of individual taxpayer identification numbers, which, as appellants have demonstrated, can be used for background checks and to carry out credit checks and to ensure verification such that rent payments are properly received. But our overarching point on this, Your Honor, is that this Court need not reach or decide that question. If this Court decides... Mr. Swalwell, I was wondering, you kept talking about it, we're at 12B6. Yes, Your Honor, we're at the 12B6 stage and our position is that, pursuant to inclusive communities, we have pled all the elements of a disparate impact claim and, accordingly, this case should be vacated and remanded. The robust causality requirement should not be interpreted to require more, given that the plaintiffs and appellants in this case have identified a specific policy responsible for the statistical imbalance. It is important to recognize that, rather than just offer a statistical imbalance from various years based on population shifts, one of the things the appellees claim that we are doing, rather, in this case, we have identified a specific course of conduct pursued by the appellees and then tethered that course of conduct to the statistical imbalance in this case. Sir, thank you.  Oh, I'm sorry. Excuse me. I'm sorry. I'll make this first. May it please the Court, Tara Fulham on behalf of former HUD officials who have a strong interest in ensuring that there's meaningful enforcement of HUD's rules and policies regarding housing discrimination. The Court below held that plaintiffs were unable to avail themselves I take it. Excuse me? You're going to talk about a little policy here. A little bit, yes. We're not going to decide it on policy. It's going to be on law how we're going to decide the case. 12B6 questions whether it's a prima facie case, questions whether this inclusive communities project is properly interpreted. If the district court did not properly interpret it, send it back for the proper procedure. But in terms of what the effect and what it means, I'm not sure this is the case that that happens in if this is 12B6. I think that the interest here of the former HUD officials is just to ensure that and to note that the heightened pleading standard that the district court appeared to apply is inconsistent with HUD's interpretation of the Fair Housing Act as embodied through the HUD discriminatory effects rule and through the guidance documents that they have released. And the appellees in their brief have argued that the HUD enforcement framework is somehow irrelevant or has been overridden by the inclusive communities case. To the contrary, we believe that the case does not undercut the HUD regulatory framework, but in fact is consistent with the regulatory framework. There's nothing in the inclusive communities opinion, which cites to the HUD rule in multiple instances, that indicates that the court disagreed with the HUD rule or intended to override it. And in fact, the opinion is consistent with the burden-shifting approach that's set forth in the HUD disparate impact regulations. First, the HUD rule requires that a practice actually or predictably results in a disparate impact on a protected class, and that actually and predictably results language effectively achieves the same result as the court's robust causality requirement. It would be a mistake, as appellants, counsel has pointed out, to read the robust causality language to require something more than a showing that a question or challenge policy has actually and predictably resulted in a disparate impact. Second, the HUD rule allows for a defendant to maintain a policy with a disparate impact if they could show a valid business interest, and that's consistent with the safeguards that the court articulates in the inclusive communities case. In any event, HUD cannot have a standard lower than that articulated by the Supreme Court in the inclusive communities, can it? That's correct. So that's kind of where we are is inclusive communities. I'm not sure how much we get into the regulations if we determine the trial court didn't correctly go with the inclusive communities interpretation. That's correct, sir. Thank you. Thank you. And now, Mr. Dingman, I apologize for giving you the wrong signal there. May it please the court, Michael Dingman for the appellees. I'm with me today are Grayson Haynes and Justin DeBettencourt. Before dealing with inclusive communities, I wanted to at least mention the waiver argument that we made under Rule 28. The court is absolutely correct. This case was decided on the application of inclusive communities to the complaint. But that's not how the issue was framed before this court. In the statement of issues, it was framed as the district judge determined that the policy was not a remnant of the past intentional discrimination of this country. Hard stop. There is no reference to inclusive communities. There's no statement that the district judge failed to properly apply inclusive communities. There is a complete failure to comply with Rule 28. And this court has held previously that that constitutes a waiver of arguments that are not set forth in the statement of issues. What if the statistical evidence in this case was the same, but instead of eviction based on failure to show legal presence, the policy evicted tenants with kids? Would the plaintiffs be able to make a prima facie case of desperate impact under that scenario? Under that scenario, Your Honor, I think the question that is required to be answered under inclusive communities is are they affected and impacted differently because of their protected status? That's the requirement under the Fair Housing Act, and that's the requirement articulated by the Supreme Court in inclusive communities. What's being presented in this case is you can demonstrate and make out a prima facie case of disparate impact by simply identifying a policy and statistics. No, the other way around. Identifying statistics, statistical disparity, and then indicating it arises from a policy. Well, but what they've done here is said in this particular area of Fairfax County, Latinos happen to be the largest constituent of undocumented aliens. I'm just dealing with inclusive communities. Inclusive communities didn't say look to see if there's a policy that caused the effect, which is what it looks like the trial judge did. It goes the other way. Look at the disparate impact because Justice Kennedy says yes, in a 5-4 decision, you can use that. Then he goes into the whole business of the robust causality, but that's sort of leaping because he says what you need is a policy. There's a policy in this case. I think the key in inclusive communities, Your Honor, is the robust causality requirement. The court repeatedly held that simply pointing to statistical imbalances are not sufficient to state a claim. But they're saying that the parks policy resulted in housing becoming available to Latinos at a disproportionate rate. It seems to me that so much of what Judge Ellis was doing and what you were doing in that this policy was reasonable, anti-harboring, all these things. But that's at the next stage of the burden shifting. For our purposes of the adequacy of the complaint, we've got to look at whether their allegation that the policy caused housing to be unavailable to Latinos at a disproportionate rate is sufficient to go forward. Don't we? But it has to be because of the fact that they're Latino, not because of the fact that they're in the United States illegally. And when you look at their complaint in paragraph 40, they allege that the policy targeted illegal aliens, not Latinos. They do not allege that Latinos... That's the crux of the difference in your interpretation of the Supreme Court's case. You're looking at the policy and saying does the policy then inform this? But from the other view, you look at is there a statistical disparity here or is there a disparate impact here? Yes. If the answer is yes, then you move to say where's the policy? And then if you say yes, you basically have given yourself to the prima facie case of it. There's another day here. And you might, looks like to me you could win down the road once you get into the is there a legitimate reason for this policy? The court's not there on that. Well, I think the court, they were sufficient and we argued that issue. But let me go back... Maybe, but you just didn't get there. Well, let me go back... It's not before us. I mean, there's no question you've got a strong argument as to the fact that a business owner has a strong interest in seeing that the law is complied with. But that's really not part of our analysis here, I don't think, is it? No, I think the key analysis is the causality. And I think if the court says, if you can identify a policy and say, well, if you apply that policy to this segment of the population, which already has an existing statistical imbalance, then you can make out a claim for disparate impact. The Supreme Court in inclusive community said absolutely not. It specifically said that defendants are not responsible for statistical imbalances that they did not create. So all that they've alleged here is not that Latinos are treated differently. Latinos comply with the policy. What they're saying is illegal Latinos in this country cannot comply with this policy. And they do not even allege that non-Latino illegal immigrants are treated differently. So if you look at the class that's affected, illegal aliens, there are no allegations that they're impacted any differently than an illegal alien from Korea or Norway or any other country. Mr. Dingman, is it your position that a policy has to facially target a protected class? No, sir. My position is under inclusive. That if the policy does not do this, then you don't even go there, even if it shows this impact. I believe when the court said there must be a robust causal connection, it was applying the because of requirement under the Fair Housing Act. There can be no claim whether it's disparate treatment or disparate impact unless it's because of the protected class. That's the robust causal connection that has to be made. And what is clear here is that the female plaintiffs are impacted not because they're Latino. They're impacted because they're illegal aliens. The male plaintiffs, who are also Latino, complied with the policy and signed multiple leases. So that's the missing link, and it has to be part of a prima facie case. Okay, so really the language then that you're relying on from inclusive communities, does this sum up exactly what your position is? If the statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability. That is part of it. But I think the underlying issue here is under the Fair Housing Act, and this is straight out of the statute, it only prohibits acts that discriminate because of a protected class. So impacting a protected class does not create a cause of action. That's precisely what this court held in the Edwards case. Well, for purposes of their pleading, and as to the first element, why don't you count the illegal aliens in that? Because, for example, if they're evicted, their male friends are also evicted. So why don't you count them in the numbers? Because they are on their own, have complied with the policy and signed leases. The fact that the female plaintiffs are, and I think this is an important point, the female plaintiffs are in a different position, not because they're Latino, but because they're in the United States illegally. So when you go to a simple causality analysis, what is the cause of the impact of this policy on them? That sounds just like the dissenting argument in the opinion in the inclusive communities case. That's really the dissenting view in that case. That's not the majority opinion. Well, I think that is exactly the majority view. I better read it differently, but that dissenting opinion says just about what you just said right there. Well, what the court said in the majority opinion, and clearly there was a lot of back and forth, one of the things I think is important to highlight what the decision was is there was criticism of the Gallagher versus Magner case from the Eighth Circuit. In that case, the Eighth Circuit affirmed or allowed a disparate impact claim to go forward under the simple argument there was a policy saying you have to get rats out of rental properties. Statistics were presented to say African Americans and Hispanics will be disproportionately impacted by that policy. And the Supreme Court said absolutely not. That does not state a disparate impact claim. And the Eighth Circuit has since, inclusive communities, stated that Gallagher is no longer good law. The same theory is being presented here. You apply a policy to illegal aliens, as Judge Ellis found, then you have a disparate impact claim if you're Latina. Hard stop. There doesn't have to be any causal connection at all. All that is required is a policy and you apply it to a segment of the population, which is what the Gallagher court did, and you have a disparate impact claim. In the majority, the court was clearly saying that is not enough. A statistical imbalance is not enough. There has to be robust causality. And by robust causality, the court is hearkening back to the because of requirement under the Fair Housing Act. There cannot be a claim of any kind under the Fair Housing Act unless there are allegations that the impact is because of their race in this case. What they've alleged themselves is the policy target illegal aliens. What they've alleged themselves is the reason that the female plaintiffs cannot comply is not because they're Latino. You will not find that in their complaint. What they've alleged is they cannot comply because they're illegal aliens. And we argued to the district judge, it seems like they're trying to create a new class for protection under the Fair Housing Act of illegal aliens. And the plaintiff said, no, that's not what we're doing at all. Go there, but in essence, in inclusive communities, the court essentially said, okay, disparate impact alone is not going to be enough. We all agree on that. The Supreme Court says that. Then they go further and says, no, you have to have a showing of a specific policy that leverages that statistical disparity. That's where they are. And then once you get to that point there, then you get into you're going to fall in that next stage, which we're just not there yet. And I'll talk about that next stage, but I really think when you look at inclusive communities and robust causality, the court talked about policy and statistics. Those are givens. You have to have those or you can't get out of the case. I don't think there was a policy in that case. Well, that was one of the issues. And that's the difference is they didn't have a policy in it. The court says you've got to have, you've got to point not just to show disparity, but this is a prima facie case on 12B6. Not just the disparate impact. You've got to show there is a specific policy here, and the existence of that policy leveraged that disparity. Right. But that, the key issue that's required for a prima facie case is that the policy is causing the impact because of their race. That has to be the requirement. That's what this court found in the Edwards case where the statistics were striking. Well, that's inverted. If you're going to look at the policy and then go in and say, okay, if the policy doesn't directly cause it, then that creates, destroys the case from the beginning. That inverts it. Well, I don't think it inverts it. I think what it does, in the cases that have been decided post-inclusive communities that we cited in our brief, for example, the Wells Fargo case from the Ninth Circuit, they all have the same common theme. The policy impacted, in the Wells Fargo case, all the borrowers the same. Yes, statistically speaking, it impacted protected classes more because that was the makeup of the group. But that's not enough. That's what this court held in the Edwards case. The court held that a statistical imbalance is not enough unless you can show that the plaintiff is being treated differently because of their race. It's not just the spirit, just for treatment or statistical evidence. It's also the policy. Once you establish that, that, in fact, you've got a statistical imbalance here, and there is a policy from inclusive. Once you get there, you then are put in a different land. You've got the proper case now, but then you get a chance down the road to say, oh, we've got a legitimate reason for this. But they're not there. The problem with that, Your Honor, is... That's what's done in all the rest of the cases. The rest of the cases, look at the TBS case from the Northern District of Illinois, which looked at a rental ordinance in that case. And the same theory is being presented here. If you apply this rental policy to this statistical group, it will have a disparate impact because the makeup is a majority of a protected class. The Supreme Court made it clear that cannot state a claim for disparate impact because you can find that statistical disparity just about anywhere. Disparate treatment, disparate impact type claims is the fact that you can have a racially neutral type law that basically applies to everybody, but the impact of it is going to result in this kind of statistical disparity. And if a policy does that, that leverages that, prima facie case, then you get into the whole case to determine, well, okay, we now have established there's a disparate impact here. Do you then have a reasonable reason to do it? The key, Your Honor, though, is it has to cause it. It cannot simply be if you applied this policy two miles to the west. I don't think it says that. And Latinos are. Maybe where we're different. I don't think you start with a policy because there was no policy in inclusive community. You don't start with a policy and say, did it cause it? What you do is you say there's a disparate impact. Of course, that's not going to be enough. Is there a specific policy that leverages that? The answer is yes. The language, I think, that's key, Your Honor. There's no policy in inclusive communities. In inclusive communities, the court said the policy must cause the disparity. The court said a disparate impact claim that relies on statistical disparity must fail if the plaintiff cannot point to a policy causing the disparity. Causing the disparity. That's the key. Where are you at that point? The policy, in fact, has resulted in what it may be that you're going to end up. It's going to be all Latinos because they're the undocumented ones. But you've already satisfied the prima facie case. How do you satisfy a prima facie case when the policy isn't causing the statistical imbalance that already existed? What's the imbalance that already existed? The statistics that they say that Latinos, in this particular Fairfax County, are the majority of illegal aliens. That's their basis for saying there's a disparate impact. They're not alleging that they are impacted because of the fact that they're Latino. And I think that's a critical point. Let's see where we go with that. If we start out and say, I see where you're going. You said you want to start and say that undocumented Asians statistically are more Latinos and, therefore, if you target that, it's going to go in that direction. But that follows from a lot of things. If you start with the policy first, yes, by definition, the policy can cause certain things to happen. But if it's already existing, that's not the analysis of a disparate impact case. But the key, I think, in causing the disparity is how you've seen inclusive communities handled by federal courts since that time. And time and again, at the motion-to-dismiss stage, the prima facie case is not made because the allegation is simply a policy is being applied to a group of individuals and the makeup happens to be that a majority are a protected class. And the courts have uniformly said, if you're affected the same as everybody else, then you cannot make out a prima facie case. Let me ask just a few more questions. Sure. Because I think we are sort of going back and forth, but it's fundamental. And I'm getting educated by it, too. But as I understand, you are saying that the policy has to cause the statistical disparity. The policy has to cause. Make sure. Am I correct? That's what you're saying? That's the first part. But that's not Griggs, though. Griggs is totally different. Well, Griggs didn't talk about robust causality, and Griggs was a different. But you've just thrown Griggs under the bus with that. We've not thrown Griggs under the bus. What the court held in the Fair Housing Act context, not in the employment context, the court was very concerned that disparate impact not be so broad that it undermines the purpose of the Fair Housing Act itself. And if you can simply say, if you have a policy and you apply it to a population that already has a statistical imbalance, you have a prima facie case, then there is no limit to that claim. What the court's. . . I'm sorry, sir. Their complaint says that Latinos are being evicted from waffles in disproportionately higher numbers than non-Latinos. Is that what their complaint says? But when you look at paragraph 40 of the complaint, the allegation is the policy target illegal aliens. And then the argument and the allegations are the most predominant segment of the undocumented population are Latino. So they're impacted not because they're Latino. They're impacted because in that part of Fairfax County, they happen to be the largest segment of undocumented aliens. If you move two miles to the west, and the majority of undocumented aliens were from Korea, then Latinos would not have a claim. And that shows why this makes no sense. The court in inclusive communities was critically concerned about letting this disparate impact claim go too far. So you're saying that protected group status cannot be accorded if it depends on a population that can shift from place to place. That's correct. It cannot be a protected group. Because of requirement of the Fair Housing Act itself cannot be met. And I think that's the essential question for the court. What is the cause of the impact of the policy? And if the answer is it's not because they're Latino, then there is no claim. Thank you, sir. On that point, I do want to, because I think that's fundamental to where we're going. And I'm thinking if you had a disparate, you had a policy that basically distinguished between education levels, for instance. There's no way that policy caused the educational levels. And you're telling me there's no way it could be a disparate impact that arises from that. Because the policy didn't cause it. It's simply distinguishing between it. Under inclusive communities, I think that's correct. And when you look at the courts that have interpreted inclusive communities, that's what they say. If you show that the impact falls on a protected class more heavily, that's not enough. You have to show that it falls on them more heavily because of their protected status. And that's what's missing here. Thank you. Mr. Runknarr? Mr. Runknarr, if you could start off. I'm concerned by the aspect of your argument that Mr. Dingell is just pointing to. The protected group, let's say every trailer park in America has this policy. The protected group would be different depending on where in America you are. It would be Latinos in this part of Fairfax County. It might be Asians in San Francisco. It might be Koreans in Annandale, Virginia. And so how can that be that you have a protected group status based on the exact same policy that will be different depending on where geographically it's being applied? The answer, Your Honor, is that the plaintiff would still have to show a disproportionate burden through specific facts or statistics. And so in those other populations or other areas, if there was a policy identical to the policy at hand, the plaintiff would still have to proffer statistics and facts. Right, but what I'm saying is, let's say the statistics show every trailer park in America has this policy. And what if the statistics show that there are lots of Koreans in Annandale, Virginia, part of Fairfax County? Okay. And so let's say there's a trailer park in Annandale, and they would be affected by this policy if they are, in fact, undocumented. Well, they're not protected if you move seven miles west to Waples Mill Trailer Park. How can that be that the protected status and the protection under the FHA depends on where geographically the exact same policy is applied? Your Honor, our answer would be, again, that this is largely a byproduct of the fact that this is the pleading stage, that because of requirement in the FHA is an ultimate question of liability. As this panel pointed out a number of times, the defendant has the opportunity to articulate a business necessity. But at the prima facie stage – Right, but that's the legitimate non-discriminatory reason in the burden-shifting part of the analysis. But I'm trying to back it up a little bit earlier and ask you, how can it be that the exact same policy would grant protected status to a group based on national origin six miles to the east but not do so six miles to the west? I'm having trouble grappling with it. I'm sympathetic with what you're saying, but to me that's – it's somewhat of an obstacle. Well, let me – can I – it would probably help to answer her question. Statistically, in this case, you have 60% living in lawfuls or Latinos, but 90% are being evicted. Is that a fair statement? That is a fair statement, Your Honor. And, Judge Keenan, to return back to your question, the only thing we would submit on that point is that, again, it's not just enough to show a difference in absolute numbers of individuals or particular races or classes affected. There must be a demonstration of a disproportionate burden. And it may be, in some cases, that a disproportionate burden could be shown, and it may be, in some other cases, that a disproportionate burden could not be shown. But ultimately, a facially neutral policy like this one can be challenged under a disparate impact theory by proffering statistics showing a disparate impact along with a policy. From there, liability is certainly not automatic, given the other prongs of the framework. Now, I want to also address opposing counsel's treatment of Griggs versus Duke power, because I think that is a useful analog to guide this Court's decision-making. Now, true, in inclusive communities, the Court did caution that defense could not be held liable for disparities they did not create. But, again, this goes to the ultimate question of liability. Indeed, one could argue that in Griggs, for example, that the defendant did not create the facially neutral distinction on the basis of a diploma, yet, nonetheless, a disparate impact claim was stated. And the reason for that is that there was a specific disparity tethered to concrete action taken. Ultimately, at the 12B6 stage, based on inclusive communities, the appellants in this case discharged their burden. They identified a specific concrete policy and then tethered that policy to statistical evidence at the state level. Therefore, their prima facie burden was discharged and the case should move forward, and this Court should vacate and remand for further proceedings. All right. Thanks very much, sir.
judges: Barbara Milano Keenan, James A Wynn, Jr., Henry F. Floyd